HOOD, Judge
(dissenting).
I am unable to agree with the majority in the conclusions which were reached in this case.
Plaintiff was injured on December 13, 1966. Shortly after the injury was sus *369 tained defendant’s claim manager sent him to the Physicians and Surgeons Clinic for examination and first aid treatment. Upon reporting to that clinic he was examined and treated by Dr. Humphrey Hardy, a general practitioner, and he has remained under Dr. Hardy’s treatment since that time.
This suit was instituted on November 9, 1967, or about 11 months after the accident occurred. In plaintiff’s original petition he alleged that he sustained a “cervical strain” and “other injuries to the back, neck and other portions of the body,” and for these injuries he demanded damages in the sum of $38,900.00. Defendant filed an answer to the original petition on November 17, 1967.
A myelogram was performed by Dr. Fred C. Boykin, a neurosurgeon, on December 29, 1967. About two weeks later plaintiff filed an amended and supplemental petition, alleging that in addition to the injuries already specified, he also sustained injuries consisting of “ruptured interverte-bral discs,” and he increased his demands to $88,000.00. On February 21, 1968, plaintiff filed a second amended and supplemental petition, demanding damages in the sum of $108,000.00. Defendant filed answers to both of these amended petitions.
A pretrial conference was held on March 25, 1968, and in that conference the case was scheduled for trial on June 24, 1968. It also was noted that at the trial plaintiff intended to introduce the following exhibits:
“ * * * X-rays taken of the plaintiff, a chart or photograph of the intersection, the medical bill of Dr. Boykin, the radiologist bill, the bill from Snell’s Limbs and Braces, the bill from the P & S Clinic, the bill from Dr. Higgenbottom, the hospital bill and a bill from Dr. Hardy. Also to be introduced is the sample case used by the plaintiff in his business as a cookware salesman, and the cervical neck collar worn by the plaintiff.”
The majority has held that “Dr. Hardy examined the plaintiff for the benefit of the defendant.” I agree that the initial examination made by Dr. Hardy was at defendant’s request and for its benefit, but I do not think it can fairly be said that any subsequent examination made or treatment administered by Dr. Hardy was for the benefit of defendant. If we should assume, however, that all of the subsequent examinations made by Dr. Hardy were for defendant’s benefit, an assumption which is more favorable to plaintiff than the facts found by the majority, that should not preclude the defendant from having plaintiff examined at this time by a specialist in the field which embraces the injury which plaintiff allegedly received.
The majority found that Dr. Boykin, the neurosurgeon who performed the myelo-gram, was “neutral.” I think the record and the oral arguments of counsel show clearly that the examination made and mye-logram performed by Dr. Boykin were for the benefit of the plaintiff. It is true that Dr. Hardy referred plaintiff to Dr. Boykin on December 20, 1967. A few days thereafter, however, defendant was contacted, probably by someone at the hospital, and was asked if it would authorize the performance of a myelogram on plaintiff and would pay for it. Defendant refused to do either. Plaintiff’s counsel was then contacted and he authorized the performance of the myelogram. Dr. Boykin’s report was submitted to plaintiff’s counsel, who thereupon sent a copy of it to defendant. Before the myelogram was performed plaintiff claimed medical expenses of $400.00. After it was performed he increased his demand for medical expenses to $8,000.00, and among the documents which he expects to introduce at the trial are the bill of Dr. Boykin, the bill of the radiologist who assisted him in performing the myelogram and the hospital bill. These facts indicate to me that Dr. Boykin examined plaintiff solely at plaintiff’s request and for his benefit.
*370 Assuming, however, that Dr. Boykin was a “neutral” doctor, as found by the trial judge and the majority, that still should not preclude defendant from having plaintiff examined by an orthopedic surgeon. Up to the present time defendant has never been permitted to have plaintiff examined by a specialist of any kind, and as far as the record shows plaintiff has never been examined by an orthopedic surgeon. There was some speculation during the oral argument that Dr. Higgenbottom, who examined and treated plaintiff in Alabama, was an orthopedic surgeon. But defendant has never received a report of that examination and thus has received no benefit or information from it.
The, majority has held that “defendant should not be seeking an examination by an orthopedic surgeon but should be seeking an examination by a neurosurgeon.” And plaintiff argues that a “ruptured cervical disc” falls exclusively within the specialty of a neurosurgeon and it is not included in the field of orthopedics.. I find nothing in the record which tends to support such a conclusion, and the research which I have been able to do on the subject convinces me that an injury consisting of a ruptured in-tervertebral disc does fall within the specialty of an orthopedic surgeon.
In Schmidt’s Attorneys’ Dictionary of Medicine, for instance, I find the following definitions:
“Neurosurgery: The branch of surgery devoted to work on the brain and other parts of the nervous system.”
“Orthopedics: The branch of surgery dealing with bones, joints, and related structures. It is concerned with the preservation and, if necessary, restoration of the functions of the skelton in the living body. It treats the diseases and deformities of the parts of the body concerned with motion, i. e., the bones, joints, muscles, fasciae, etc. Orthopedics relies on manipulation and mechanical devices as well as on surgery.”
In Blakiston’s New Gould Medical Dictionary, the following definitions are found:
“Neurosurgeon: One who specializes in surgery of the brain and the nervous sytem.”
“Neurosurgery: Surgery of the nervous system.”
“Orthopedics: That branch of surgery concerned with corrective treatment of deformities, diseases and ailments of the locomotor apparatus, especially those affecting limbs, bones, muscles, joints, and fasciae, whether by apparatus, manipulation, or open operation. Formerly devoted to the correction and treatment of deformities in children.”
In Corpus Juris Secundum these terms are described as follows:
“Neurology is that branch of science which treats of the nervous system; that branch of medical science which is particularly concerned with diseases of the nervous system. It treats essentially of the brain and comprehends those diseases involving actual structural changes of the nervous system.” (70 C.J.S., Physicians and Surgeons, Sec. 1, p. 809.)
“Orthopedist. One who practices orthopedics ; a surgeon engaged in that branch of medicine which deals with the correction of deformities and chronic diseases of the joints and spine.”, (70 C.J.S., Physicians and Surgeons, Sec. 1, p. 812.)
These definitions indicate, I think, that the diagnosis and treatment of an injury consisting of a ruptured intervertebral disc falls more appropriately within the specialty of an orthopedist than that of a neurosurgeon. Certainly, however, there is enough merit to defendant’s assertion that this alleged injury can or may fall within the field of orthopedics to entitle it to have plaintiff examined by an orthopedic surgeon.
*371 But even if we assume that a “ruptured intervertebral disc” does not fall within the specialty of the orthopedic surgeon, an assumption with which I do not agree, I think my colleagues have overlooked the fact that in addition to a ruptured disc, plaintiff also alleges that he has sustained other injuries consisting of a “cervical sprain" and “other injuries to the back, neck and other parts of the body." I do not believe it can he argued logically that none of these injuries could conceivably come within the specialty of an orthopedic surgeon.
In holding that defendant is not entitled to have plaintiff examined by a specialist in the field of orthopedics, the majority relies on the cases of Lindsey v. Escude, 179 So.2d 505 (La.App.3d Cir.1965); Abshire v. Hartford Accident and Indemnity Company, 179 So.2d 508 (La.App.3d Cir.1965); and Woods v. Grain Dealers Mutual Insurance Company, 159 So.2d 410 (La.App.2d Cir.1964).
In my opinion, none of these cases is applicable here. The only issue presented in the Escude and Abshire cases was whether the trial judge, by ex parte order and without a contradictory hearing, could require a plaintiff to submit to a physical examination. A contradictory hearing was held in the instant suit, so no such issue is before us here.
In the Woods case, supra, each of the two plaintiffs alleged that he had sustained a “cervical or neck strain, a whiplash type injury,” that being substantially the same type injury which plaintiff in the instant suit alleges he sustained. In the Woods case each of the plaintiffs had already been examined by two orthopedic surgeons, one of whom had been selected by plaintiffs and the other by defendant. Defendant had been furnsihed with copies of medical reports from all doctors. Defendant then attempted to compel plaintiff to submit to another examination by a third orthopedic surgeon. Our brothers of the Second Circuit Court of Appeal held, correctly I think, that in view of the previous examinations made by other orthopedists the trial court had not abused its discretion in refusing to compel plaintiff to submit to another examination by a third specialist of the same type. In the instant suit, of course, there has been no other examination by an orthopedic surgeon.
In the Woods case, the appellate court quoted the following language which was used by our Supreme Court in the case of Kennedy v. New Orleans Railway & Light Company, 142 La. 879, 77 So. 777 (1918):
“We find no fault with the ruling of the trial judge to the effect that he was without authority to require plaintiff to permit an examination of her person; but, on the other hand, we do not see how the jury and the judge could reach a legal verdict and judgment against the defendant upon an ex parte version of physical injuries, of the nature and character of which plaintiff permitted only the witnesses selected by herself to become informed; for, if defendants in such cases can be condemned upon that basis, they will always be at the mercy of the plaintiffs, .who have only to complain of injuries not visible outside of their clothing, produce themselves and their own selected witnesses to testify to them, and sit tight, with no fear of possible contradiction. Such a proceeding, however, fails to furnish the principal element required in due process of law, to wit, a hearing, and ordinarily would be dismissed, since a court cannot well place a value upon ex parte testimony.”
In Ishler v. Cook, 299 F.2d 507 (C.A. 7th, 1962), the court said:
“The Court may order more than one physical examination of a plaintiff in an action, based on personal injury to obtain the full truth concerning the matter in controversy. City of Valparaiso v. *372 Kinney, 1921, 75 Ind.App. 660, 664-665, 131 N.E. 237, 238. Here plaintiff’s doctor had testified to a change in the plaintiff’s physical condition which had occurred since the examination made by the defendant’s doctor.”
In Marshall v. Peters, 31 F.R.D. 238 (Ohio, 1962), the court said:
“A reading of Rule 35(a) does not indicate an intent to establish a single examination limitation, and where alleged injuries fall into two entirely separate areas of medical specialization, examinations by practitioners in such fields are held to be authorized under the Rule.”
And, in Barron and Holtzoff, Federal Practice and Procedure, the following observation is made:
“A state court, construing a rule similar to the federal rule, has refused to order examination by more than one physician, but such a limitation is wholly inconsistent with the realities of modern medical practice. Where specialists from various branches of medicine are required, there is nothing in the rule to prevent the court from ordering examination by all of them.” (Barron and Holtzoff, Federal Practice and Procedure, Volume 2A, Section 822, page 483.)
I agree that the defendant must show good cause for requiring the plaintiff to submit to another physical examination. Also, I think the examination requested must be reasonable and plaintiff should not be subjected to harassment. In the instant suit, however, good cause has been shown. Shortly before the request for another examination was made plaintiff amended his petition twice, alleging a much more serious injury and demanding substantially greater sums of money as damages. Defendant has not been permitted to have plaintiff examined by any doctor since this more serious condition allegedly was discovered. In fact, the only physical examination which defendant has ever had made of plaintiff was the one made by Dr. Hardy, a general practitioner, on the day the accident occurred. Some of the injuries alleged by plaintiff certainly fall in the field of orthopedic surgery, and yet plaintiff has never been examined by an orthopedist. It cannot be said that plaintiff is being subjected to harassment by the request for a second examination after a lapse of about 17 months. The examination is to be made in the Parish where plaintiff resides, and the court may specify a time which is convenient to plaintiff. I see nothing unreasonable about requiring such an examination.
I am compelled to disagree with my colleagues in their conclusion that defendant should be denied the right to have plaintiff examined again because such an examination may “confuse the medical aspect” of the case or it may “muddy” the evidence. The purpose of a trial is to seek the truth. If there is conflicting medical evidence in the case I think it should be presented even though it may “confuse the medical aspect” of the case and “muddy” the evidence.
For these reasons, I respectfully dissent from the judgment rendered by the majority.